UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| VALERIE PADIN<br><br>Plaintiff,<br><br>v.<br><br>CAROLINE W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | No.13-cv-03501<br><br>Magistrate Judge Susan E. Cox |

**ORDER**

Plaintiff Valerie Padin seeks to overturn the Administrative Law Judge's final decision denying her application for Disability Insurance Benefits under Title II of the Social Security Act. Plaintiff's Motion for Summary Judgment is granted [dkt. 18] and Defendant's Motion for Summary Judgment is denied [dkt. 25]. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

**STATEMENT**

Plaintiff Valerie Padin ("plaintiff") seeks to overturn the Administrative Law Judge's ("ALJ") final decision denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.[1] The parties consented to the jurisdiction of United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). After careful review of the record, the Court now remands the case for further proceedings.

---

[1] 42 U.S.C. §§ 405(g), 416(i), 423(d).

1

I.  **FACTUAL BACKGROUND**

Plaintiff completed her application for DIB June 8, 2010, alleging disability as of January 21, 2009 as a result of slipping on ice while at work.[2] Plaintiff lists a lower back injury, hypothyroidism, depression, PTSD, and nerve damage to her left leg as the conditions impacting her ability to work.[3]

First, plaintiff alleges physical disability due to severe back pain and pain in her left leg. A brief history of plaintiff's back problems reveals diffuse disc bulging and degenerative disc disease at L5-S1 consistent with disc desiccation.[4] Plaintiff began seeing Richard D. Lim, M.D., as her orthopedic physician in March 2007.[5] During the course of his treatment, Dr. Lim found plaintiff's symptoms consistent with Radiculopathy and recorded a positive left sided straight leg raise in March 2007, and in May and December 2010.[6] While Dr. Lim did not see plaintiff from January 2008 to May 2010, at the request of her attorney, plaintiff followed up with Dr. Lim on May 18, 2010 and received an x-ray showing the disk space at L5-S1 had collapsed leaving the vertebrae virtually bone-on-bone.[7] In May 2010, Dr. Lim noted plaintiff was not a candidate for disk replacement since she had greater than 50% disc height collapse, and in December 2010, Dr. Lim ordered injections for plaintiff's back.[8] In February 2011, Dr. Lim concluded that plaintiff had not improved despite physical therapy and injections.[9] In addition to Dr. Lim's findings, plaintiff's primary physician, Jose Rodriguez, M.D., described her back pain as a chronic problem, one that waxes and wanes.[10] Plaintiff reported that her back pain affects her ability to

---

[2] R. at 139, 142.
[3] R. at 174.
[4] R. at 373.
[5] R. at 178.
[6] R. at 359.
[7] R. at 360.
[8] *Id.*
[9] R. at 454.
[10] R. at 398.

walk or run (her former hobbies), prevents her from showering alone in case of back spasms, and prevents her from holding her child.[11] Plaintiff further explained all activities are limited to her house, and that her son is often with her father-in-law when she is unable to care for him.[12]

For purposes of her disability application, two State agency physicians examined plaintiff. During her Physical Residual Functional Capacity assessment, Victoria Dow, M.D. found plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry ten pounds, stand, walk, and sit about six hours during the workday, and push or pull unlimitedly.[13] Dr. Dow also concluded plaintiff could never climb ladders, ropes, or scaffolds and could occasionally stoop.[14] David Bitzer, M.D. affirmed Dr. Dow's assessment after reviewing the evidence in the file.[15]

In her disability application, plaintiff also argues depression and PTSD affect her ability to work. However, these problems do not appear in the record until 2010, a year after her alleged onset of disability. Plaintiff began treating with psychiatrist Sudhir M. Gokhale, M.D., and Mr. Hurley, a social worker, in September 2010 and May 2011 respectively.[16] Dr. Hurley's summation of plaintiff's condition is that she has had a limited response to treatment despite her compliance with treatment.[17] He found plaintiff suffers from major depression and PTSD, and that she is irritable and anxious around others, which affects her ability to cope with supervisors.[18] Mr. Hurley listed that plaintiff suffers from recurrent panic attacks manifesting from sudden, unpredictable onset of apprehension and fear, as well as recurrent and intrusive

---

[11] R. at 185, 217, 222.
[12] R. at 182-83.
[13] R. at 331.
[14] *Id.*
[15] R. at 394.
[16] R. at 560, 564.
[17] R. at 560-61.
[18] R. at 560.

recollections of a traumatic experience.[19] In a separate analysis, Dr. Gokhale also diagnosed plaintiff with depression and PTSD with similar findings to Mr. Hurley.[20] After numerous sessions with plaintiff from September 2010 to May 2011, Dr. Gokhale submitted these determinations for the purpose of her disability application noting she suffered from nightmares, insomnia, hyper vigilance, and trust issues.[21] Dr. Gokhale concluded that these issues stem from an abusive past and the trauma of her boyfriend beating her son to death in 2003.[22] Dr. Gokhale assessed plaintiff's GAF score at 50, which rates an adult's ability to function as seriously impaired[23] and noted that plaintiff reported taking Xanax in the past.[24]

With respect to plaintiff's mental health, the two State agency doctors concluded that plaintiff does not suffer from marked limitations or episodes of decompensation. B. Johnson, PhD, performed a psychiatric review on September 20, 2010 and concluded there were no limitations after evaluating plaintiff.[25] Additionally, on August 16, 2010, M. S. Patil, M.D., performed an Internal Medicine Consultative Examination and concluded plaintiff's orientation, memory, and ability to relate were within normal limits.[26] However, this examination only lasted 35 minutes and Dr. Patil noted that due to plaintiff's disruptive child it was not possible to gather a "detailed history and perform [a] satisfactory evaluation."[27]

After considering the evidence, the ALJ concluded the following: (1) plaintiff suffers from mild restrictions of daily living, moderate restrictions in social functioning and

---

[19] R. at 563.
[20] R. at 464-65.
[21] R. at 569, 572, 574.
[22] R. at 572.
[23] Global Assessment of Functioning (GAF) scores are a scale used to rate an adult's overall ability to function. *See Craft v. Astrue*, 539 F.3d 668, 676 n.7 (7th Cir. 2008) ("A GAF score of 50 indicates serious symptoms"); *Farrell v. Astrue*, 692 F.3d 767, 769 (7th Cir. 2012) (explaining plaintiff had received a score of 51 which is on the border of moderate and serious symptoms).
[24] R. at 578.
[25] R. at 314-28.
[26] R. at 311-12.
[27] R. at 311.

concentration, persistence, and pace, and has experienced no episodes of decompensation, and (2) plaintiff has the Residual Functional Capacity ("RFC") to perform light work except she cannot climb ladders, ropes, or scaffolds.[28] The ALJ found plaintiff was not disabled.[29]

## II. STANDARD OF REVIEW

Section 405(g) of the Social Security Act authorizes judicial review of the Commissioner's final decision. In reviewing this case, the Court's task is not to "displace the ALJ's judgment by reconsidering facts or making credibility determinations."[30] The Court's task is to determine whether the ALJ's decision is "supported by reasonable evidence, meaning evidence a reasonable person would accept as adequate to support the decision."[31] The ALJ does not have to "address every piece of evidence or testimony presented, but must provide a logical bridge between the evidence and her conclusion that a claimant is not disabled."[32] If the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."[33]

## III. FIVE STEP INQUIRY

Claimant is disabled if she is unable to do any substantial gainful activity due to any "medically determinable physical or mental impairment which can be expected to result in death" and has lasted or is expected to last continually for no less than twelve months.[34] The Social Security Act provides a five step evaluation process for determining whether a claimant is disabled: (1) Is the claimant employed in substantial gainful activity (2) Is the claimant's

---

[28] R. at 32.
[29] R. at 33.
[30] *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).
[31] *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).
[32] *Id.*
[33] *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).
[34] *See* 20 C.F.R. § 404.1505(a)(4)(i-v).

impairment severe (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations (4) Can the claimant engage in past relevant work and (5) Is the claimant capable of performing other work?[35]

## IV. DISCUSSION

In support of plaintiff's request for remand, she raises several issues for review. We will only focus on whether the ALJ properly evaluated and explained the weight she afforded to the treating and state physicians, and within this analysis, how the ALJ determined the RFC. We will also briefly touch on the credibility analysis.

### A. Weight Attributed to the Doctors

The ALJ's weight evaluations for the treating and state doctors are insufficient. An ALJ must determine what weight to give a physician's opinion by considering: (1) the length of the treatment relationship, frequency of examination, and the nature and extent of the treatment relationship; (2) the supportability of the opinions by medical signs and laboratory findings; (3) the consistency of the opinion with the record as a whole; and (4) whether the opinion was from a specialist.[36] Additionally, the ALJ must explain the weight she gives each doctor.[37] Here, the ALJ failed to demonstrate full consideration of the regulations, provide a rationale for her determination, and articulate what weight she gave each doctor.

#### i. Mental Health

In her decision, the ALJ gave no weight to Dr. Gokhale because she found his determination regarding the severity of plaintiff's mental impairments inconsistent with

---

[35] 20 C.F.R. § 404.1520(a)(1).
[36] 20 C.F.R. § 404.1527(c)(2)-(5).
[37] *See Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010) (stating even if the ALJ had articulated good reasons for rejecting the doctor's opinion, it was still necessary to determine what weight to give him under the regulations).

6

treatment notes.[38] However, an ALJ must explain these inconsistencies in her reasoning.[39] Here, the ALJ finds that plaintiff "generally exhibited fair to good attention and concentration, and was otherwise appropriate on examination,"[40] but she does not explain how this detracts from Dr. Gokhale's notes, nor is this an adequate reason to find Dr. Gokhale inconsistent with the record as a whole.[41] Dr. Gokhale's treatment notes are replete with findings that support plaintiff's PTSD. For example, he determined in 2011 that plaintiff continued to "have nightmares [three to four times] a week" with the "recent break in at neighbor's house as [a] possible trigger,"[42] and that she suffered from insomnia and was hyper-vigilant to "noises [and] physical space to men."[43] Dr. Gokhale also noted plaintiff received a GAF score of 50[44] which indicates serious functional impairments to daily life.[45] The ALJ must explain how these findings do not correspond with the other evidence in the record to properly dismiss Dr. Gokhale's opinion. Finally, the ALJ cites plaintiff's return to work, despite her PTSD, as evidence inconsistent with Dr. Gokhale's assessments. This alone, however, is not enough to completely discredit Dr. Gokhale. The Seventh Circuit recognizes that even persons who are disabled may work long after they might have been entitled to benefits and their disability actually commences.[46]

---

[38] R. at 31.
[39] *See Bailey v. Barnhart*, 473 F. Supp. 2d 822, 838 (N.D. Ill. 2006) (finding that the ALJ erred in giving no weight to claimant's treating doctor because of inconsistency when the ALJ failed to explain how she determined different interpretations of "further"); s*ee also Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (the ALJ must explain what evidence she found to diminish the value of the treating physician's opinion). *Compare Maziarka v. Colvin,* No. 12C5897, 2013 WL 6099328, at *13 (N.D. Ill. 2013) (demonstrating an example of an ALJ articulating specific inconsistencies by mentioning that one physician found the claimant was improving in 2010, while hospital records showed claimant was suffering from degenerative disc disease).
[40] R. at 31.
[41] *See Goble v. Astrue*, 385 Fed. App'x 588, 592 (7th Cir. 2010) (holding the ALJ's reasoning improper when she found the treating physician's opinion inconsistent because the claimant appeared alert and pleasant during a physical examination since this does not diminish pain complaints).
[42] R. at 569.
[43] R. at 572.
[44] R. at 578.
[45] According to the Diagnostic Statistical Manual IV (DSM-IV), GAF scores of 41-50 indicate "serious symptoms (e.g. suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)."
[46] *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012).

Additionally, the ALJ's analysis of the 20 C.F.R. § 404.1527(c) criteria is insufficient. The ALJ mentions the length and frequency of treatment with Dr. Gokhale[47] finding that it did not start until well after her alleged onset date.[48] This would seem an appropriate reason to discount his opinion. But the regulations require more. For example, the ALJ states "the claimant has seen Dr. Gokhale and therapist Hurley for about a year, from October 2010 through November 2011. The claimant testified that she sees Dr. Gokhale every 90 days and therapist Hurley twice a month, although this frequency is not reflected in the treatment notes."[49] The ALJ does not expound upon this factor but, instead, begins to discuss plaintiff's mental conditions after giving birth to her son.[50] So while the ALJ mentions frequency, she gives no explanation as to how the frequency of this relationship affected her weight determination.

The ALJ's RFC determination is also confusing because she concluded that plaintiff has severe mental impairments but relies only on the State's psychiatrist, Dr. Johnson, who found no limitations. When the ALJ discusses plaintiff's mental impairments, she states she has "considered the opinion of the State agency physician who found no medically determinable impairment."[51] The ALJ then states that she gives no weight to either of plaintiff's treating physicians,[52] but she concludes that plaintiff has severe mental impairments.[53] The ALJ does not articulate why she finds plaintiff to have severe mental impairments because she points to no specific evidence to support her conclusion. It is possible the ALJ is attempting to come out somewhere in the middle, perhaps giving some credit to plaintiff's testimony, but her decision does not tell us where she derives her conclusion. We note that she is also not permitted to

---

[47] R. at 31.
[48] R. at 29.
[49] R. at 31.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*

8

construct her own medical determinations.[54] On remand, the ALJ should expound on her weight assessments for the treating and State doctors to demonstrate her RFC conclusions.

Lastly, the ALJ properly concluded that Dr. Hurley is not an appropriate medical source.[55] However, Dr. Hurley is still a valuable "other source" for information regarding the severity of plaintiff's impairments and how this might impact her ability to function.[56] In other words, the weight the ALJ affords the therapist is dependent on whether the opinions are supported by objective evidence.[57] The ALJ stated she found this opinion lacked backing of objective evidence because she found the impairments accompanying the B and C criteria of Listing 12.04 inconsistent with plaintiff's return to work for two years after her son was born (an event that exacerbated her PTSD) and her normal findings on consultative examinations.[58] We find given the lower threshold of explanation, where simply noting inconsistencies is sufficient, the ALJ adequately explained her reasoning for affording no weight to Dr. Hurley.

###  ii. Physical Limitations

In the ALJ's opinion, she correctly finds that treatment has been routine and conservative[59] and that no other physicians have expressed that plaintiff's limitations exceed light work.[60] However, the ALJ's RFC assessment is not complete without an analysis of the weight she affords Dr. Lim. The regulations provide that the SSA "will always give good reasons in [their] notice of determination or decision the weight [they] give [a claimant's] treating

---

[54] *See Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); *Norris v. Astrue*, 776 F. Supp. 2d 616, 636 (N.D. Ill. 2011)(stating ALJ's "are not permitted to construct a middle ground without a proper medical basis," and should include a "discussion as to how the evidence supports each conclusion, citing specific medical facts").
[55] *See* 20 C.F.R. § 404.1513 (explaining that to establish an impairment the claimant needs to provide acceptable medical sources which include, 1) Licensed physicians (medical or osteopathic doctors), 2) licensed or certified psychologists, 3) licensed optometrists, 4) licensed podiatrists, and 5) qualified speech-language pathologists).
[56] *See Eggerson v. Astrue*, 581 F. Supp. 2d 961, 966 (N.D. Ill. 2008).
[57] *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).
[58] R. at 31.
[59] R. at 30.
[60] R. at 31.

9

source's opinion."[61] While the ALJ can afford greater weight to the State doctors, the ALJ errs when she does not provide any explanation of weight to a treating doctor.[62]

Here, the ALJ only mentions Dr. Lim's findings in 2007, noting that plaintiff returned to work for two years after these findings.[63] The ALJ does not mention the rest of Dr. Lim's treatment of plaintiff following this time period, much of which identifies positive straight leg raises,[64] MRIs for plaintiff's degenerative disc disease,[65] and treatment suggestions, nor does she explain why she chooses to discount this evidence, if indeed she did. While the ALJ recounts evidence of plaintiff's impairments in her overall opinion, she does not discuss how this evidence impacts her weight assessment. For example, the ALJ mentions plaintiff's gap in treatment with Dr. Lim and plaintiff's return to him at her attorney's suggestion.[66] However, the ALJ does not discuss how or if this impacts the weight she gave, if any, to Dr. Lim.[67] Without more, we must remand for a more complete consideration of the record.

## B. Credibility Analysis

` The ALJ's decision on credibility was that plaintiff's medical history generally did "not support the degree of limitations alleged."[68] The Court treats the ALJ's credibility assessment with deference; however, an ALJ must consider the regulation factors in her reasoning.[69] The ALJ's credibility assessment is given special deference because she is best positioned to see and

---

[61] 20 C.F.R. § 404.1527(c)(2).
[62] *See Larson v. Astrue*, at 751 (stating even if the ALJ had articulated good reasons for rejecting the doctor's opinion it was still necessary to determine what weight to give him under the regulations).
[63] R. at 31.
[64] R. at 359-64.
[65] R. at 360, 470, 472.
[66] R. at 27.
[67] *See Farrell v. Astrue*, 692 F.3d 767, 772 (7th Cir. 2012) (concluding the court could not know the ALJ's thoughts when determining the physician's weight because the ALJ only cited to a handful of pages in the record and did not provide any serious discussion of the opinions).
[68] R. at 29.
[69] *See Maziarka*, 705 F.3d, ?? (citing Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008) ("If an ALJ discounts an opinion after considering the factors set forth in the regulations, the Court 'must allow that decision to stand so long as the ALJ minimally articulated his reasons—a very deferential standard that [the Court has], in fact, deemed lax").

hear the claimant.[70] Furthermore, the ALJ's decision must be upheld unless it is "patently wrong."[71] On review, the Court's task is to examine whether the ALJ's decision was reasoned and supported.[72]

The ALJ found plaintiff's impairments may not hinder her daily activities as much as she alleges. First, the ALJ found plaintiff's testimony that she spends 65-70% of her time laying down, and hardly doing any chores, conflicting with her statement to Dr. Gokhale that she feels like a nanny and maid.[73] Specifically, the ALJ concluded that such a statement "indicates that she was doing more work than alleged."[74] The ALJ then states plaintiff's refusal to undergo back surgery because she was unsure how she would manage a young child also suggested plaintiff is more active than she alleges.[75] Nonetheless, the ALJ should exercise caution when considering daily activities in her credibility analysis because a person's ability to perform daily household activities does not always mean the ability to work full time.[76]

The ALJ also found plaintiff's conservative care did not corroborate her alleged severity. For example, the ALJ states the plaintiff only received "two injections and was otherwise just treated with medications" despite complaining of excruciating pain.[77] Furthermore, the ALJ notes gaps in plaintiff's treatment. Plaintiff began treating with Dr. Lim after her initial fall in 2007; however, there is a two year gap in treatment, and the record indicates she followed up with Dr. Lim at the suggestion of her attorney.[78] Additionally, plaintiff stated her PTSD worsened after the birth of her son in 2007, yet she did not begin treating with Dr. Gokhale until

---

[70] *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).
[71] *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).
[72] *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).
[73] R. at 29.
[74] *Id.*
[75] *Id.*
[76] *Roddy*, 705 F.3d at 639.
[77] R. at 30.
[78] R. at 360.

11

2010.[79] Both gaps raise questions as to the seriousness of plaintiff's impairments and why she waited until 2010 to seek treatment. However, the ALJ did not ask plaintiff to reconcile these gaps at the hearing, which she is required to do.[80]

Additionally, the ALJ questioned the alleged severity of plaintiff's physical impairments. An ALJ may conclude that discrepancies between a claimant's self-reports and objective evidence suggests symptom exaggeration[81] and, here, the ALJ found that plaintiff's statements of leg swelling are unsupported by the record.[82] It is correct that Dr. Lim's treatment notes often state there is no swelling. The ALJ also mentioned plaintiff's claim of cluster headaches,[83] albeit in a portion of her discussion unrelated to credibility. This claim supports the ALJ's credibility finding because the ALJ noted that plaintiff only "rated the pain as mild at a 4 out of 10 severity,"[84] which is the same rating plaintiff gave to a sinus headache.[85] We note that cluster headaches are rare and intensely painful (characterized by a burning or boring pain).[86] Overall, we find that the ALJ properly supported her credibility conclusion with evidence in the record.

---

[79] R. at 576.
[80] *See Craft v. Astrue,* 539 F.3d 668, 679 (7th Cir. 2008) (stating while infrequent treatment can support an adverse credibility finding, an ALJ "'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care").
[81] *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010).
[82] R. at 30.
[83] According to the Attorney's Medical Dictionary, cluster headaches are severe headaches affecting one side of the head and face, usually accompanied by tearing of the eye on the affected side and watery discharge from the nose. The headaches are recurrent, with attacks occurring in groups.
[84] R. at 29.
[85] R. at 515.
[86] *See* AMA Complete Medical Encyclopedia, q.v. "headache" (2003); see also Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/cluster-headache/basics/definition/con-20031706 (last visited June 30, 2014) (people who experience cluster headaches "say that the pain feels like a hot poker being stuck in the eye or that the eye is being pushed out of its socket").

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is granted [dkt. 18], and Defendant's Motion for Summary Judgment is denied [dkt. 25]. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

**ENTER:**

**DATED:** July 11, 2014                                /s/  Susan E. Cox
                                                        Susan E. Cox
                                                        United States Magistrate Judge